IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CIVIL NO. 1:19-24026-KMM

UNITED STATES OF AMERICA,

        *Plaintiff*,

v.

JACQUELINE D. GREEN, as Personal Representative of the Estate of Marie Green and as Co-Trustee of the Marie Mary Green Revocable Trust; BERT GREEN, as Co-Trustee of the Marie Mary Green Revocable Trust,

        *Defendants.*

**UNITED STATES' OPPOSITION TO MOTION TO DISMISS**

Defendants Jacqueline and Bert Green, in their respective representative capacities, have moved to dismiss the United States' Complaint. (Dkt. 13.) They argue that the FBAR penalty abated upon Marie Green's death. However, all that is required is that the penalty serve a remedial purpose, and the FBAR penalty does—so it survives. The Greens also argue that the United States' Complaint (Dkt. 1) fails to state a plausible claim upon which relief can be granted. That is simply wrong, as a cursory reading of the Complaint shows. Neither of the Greens' arguments are well-founded. The Motion should be denied.

**I.   The FBAR Penalty Survived Marie Green's Death.**

The Greens raise a threshold question: whether the United States' claim for an FBAR penalty survives the accountholder's death. Two district courts have recently concluded that it does. *See United States v. Estate of Schoenfeld*, 344 F.

Supp. 3d 1354, 1370 (M.D. Fla. 2018); *United States v. Park*, 389 F. Supp. 3d 561, 575 (N.D. Ill. 2019). This Court should join them.

Whether the FBAR penalty survives is a question of federal common law. *See United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993). Under the Eleventh Circuit's articulation, survival turns on "whether the recovery is deemed 'remedial' or 'penal.'" *Id.* Remedial recoveries survive, while actions to collect a penal recovery abate. *See id.* In this context, where the United States is seeking to collect an exaction, courts have deemed the award "remedial" where it will compensate the United States for a monetary injury. That is the case even if the amount of the sanction is not fixed by a specific pecuniary harm to the government, and even if the award incidentally serves punitive goals, like deterrence. For example, a 50% penalty for fraudulently understating income tax is remedial, and survives the taxpayer's death, because it compensates the government for the costs of detecting and investigating fraud. By contrast, an exaction is "punitive" when it merely serves to punish the violation of a law.

The FBAR penalty serves important remedial purposes. It compensates the government for the costs of difficult and time-consuming investigations into the use of overseas financial accounts for illegal purposes, including tax evasion. It also acts as a form of liquidated damages for uncollectible tax revenue. It survived Marie Green's death.

### A.   *The United States' Claim for a Penalty Survives If the FBAR Penalty Serves a Remedial Purpose.*

Although the question is whether a statute gives rise to a penal or remedial claim, the label Congress places on the recovery is not dispositive. "In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial." *Taylor v. United States*, 44 U.S. (3 How.) 197, 210 (1845). "Laws enacted for the prevention

of fraud," including revenue laws, "are not, in the strict sense, penal acts, although they may inflict a penalty for violating them." *Id.* (quoting district court judge with approval; internal quotation marks omitted). In deciding whether a particular law is remedial or penal, the key distinction is whether the United States suffered monetary harm as a result of the defendant's conduct.

The Supreme Court's recent decision in *Kokesh v. SEC*, 581 U.S. \_\_\_, 137 S.Ct. 1635 (June 5, 2017), is consistent with that principle. *Kokesh* defined a penalty as a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws." *Id.* at 1642 (cleaned up). However, "a pecuniary sanction operates as a penalty only if it is sought for the purpose of punishment, and to deter others from offending in like manner—as opposed to compensating a victim for his loss." *Id.* Thus, where the sanction would compensate the United States for a loss, it is not necessarily "penal." *Cf. id.* at 1643-44 (explaining that the disgorgement order was not compensatory to the United States).

*Kokesh* is not squarely on point, however. Investors were the injured parties in that case, not the United States. *See* 137 S.Ct. at 1641. Moreover, the Supreme Court was not testing the survival of a cause of action, but whether disgorgement constituted a "penalty" sufficient to bring it within the five-year statute of limitations in 28 U.S.C. § 2462. *See id.* at 1642. Finally, and most importantly, the *Kokesh* court was guided in part by Eighth Amendment jurisprudence, which applies a different standard. *See id.* at 1645. A statute that has punitive aspects may still confer on the United States a claim that survives the wrongdoer's death as long as it serves a remedial purpose. *See, e.g.*, *United States v. Land, Winston County*, 221 F.3d 1194, 1198 (11th Cir. 2000) (citing *United States v. Ursery*, 518 U.S. 267, 290, 292 (1996), to note that while forfeiture claims have "punitive aspects," they are still remedial and survive the property owner's death).

U.S. Opp. Mot. Dismiss – p. 3

The Eleventh Circuit has identified three factors that guide it in deciding whether a recovery is remedial, and survives, or is penal, and abates:

> (1) [W]hether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.

*NEC Corp.*, 11 F.3d at 137. However, those factors were developed in the context of liquidated damages under the Truth in Lending Act, to be awarded to an injured consumer. *See NEC*, 11 F.3d at 137 (quoting factors from *First Nat. Bank & Trust Co. in Macon v. Flatau (In re Wood)*, 643 F.2d 188, 190-91 (5th Cir. 1980)); *Wood*, 643 F.2d at 191 (quoting factors from *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)). The factors contrast a payment to an individual to compensate for an injury, on the one hand, with a payment to the sovereign for a wrongful act, on the other. The TILA cases did not present, and the resulting factors do not allow for, a situation where the United States itself suffered a pocketbook injury as a result of the defendant's conduct. Case law, including cases dealing specifically with the United States, makes survival hinge on that distinction.

At common law, criminal cases abated with the defendant's death, and tort suits generally abated with the death of either the plaintiff or the defendant. Contract claims, by contrast, generally survived. *See* 3 William Blackstone, Commentaries *302 (discussing maxim *actio personalis mouritur cum persona*—a personal right of action dies with the person). Over the years, that rule was narrowed, and courts permitted tort suits to survive where "property is acquired which benefits the testator." *See, e.g.*, *Hambly v. Trott*, 98 Eng. Rep. 1136, 1 Cowp. 372, 376-77 (K.B. 1776). *Compare* John Comyns et al., *A Digest of the Laws of England*, vol. 1, tit. Admin., § B 15 (5th ed. 1824), *cited in Ex parte Schreiber*, 110 U.S. 76, 80 (1884) (noting that penal causes of action cannot be brought against the

U.S. Opp. Mot. Dismiss – p. 4

executor of an estate), *with* [id. § B 14 n.(b)](#) (noting that a tort suit will lie against an executor if the estate was benefited as a result of the tort).

Twentieth-century American case law further elaborated on that idea, holding that claims seeking to recoup a monetary injury to the United States are remedial, and therefore survive the defendant's death. For instance, in *United States v. Grannis*, 172 F.2d 507 (4th Cir. 1949), the court considered whether a suit under the previous version of the False Claims Act survived the defendant's death. The statute provided that a false claimant "shall forfeit and pay to the United States the sum of $2,000, and in addition, double the amount of damages which the United States may have sustained . . . together with the costs of suit." *Id.* at 508. The Fourth Circuit held that the United States' claim survived the defendant's death, including the $2,000 "forfeiture." *Id.* at 514-16. It reasoned that "the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole." *Id.* at 515 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943)). Likewise, government claims under the Surplus Property Act, which has a similar forfeiture clause, survive the defendant's death. *United States v. Posner*, 269 F.2d 742, 745 (3d Cir. 1959).[1] Lower courts have also held that civil forfeitures

---

[1] The distinction between government as injured party and government as enforcer is also present in a survival-related statute. 28 U.S.C. § 2404 provides that a "civil action for damages commenced by . . . the United States . . . shall not abate on the death of a defendant but shall survive and be enforceable against his estate . . . ." The statute does not apply here. Marie Green died before the United States filed its complaint. Still, § 2404 evinces Congress's intent to allow the United States to pursue claims for compensation against a decedent's estate. *See Fed. Sav. & Loan Ins. Corp. v. Fielding*, 316 F. Supp. 82, 85 (D. Nev. 1970) (explaining that the term "damages" requires the United States' claim to be for "compensatory or remedial

do not abate on the wrongdoer's death. *E.g.*, *Land, Winston County*, 221 F.3d at 1198; *United States v. $84,740 Currency*, 981 F.2d 1110, 1113 (9th Cir. 1992).

Even payments that are primarily compensatory in character can serve other purposes. The current version of the False Claims Act, for instance, still serves an important compensatory purpose, even though it now permits treble damages and carries a partially punitive character. *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129-33 (2003) (holding that although municipalities are generally not liable for punitive damages, they can be subjected to treble damages under the False Claims Act). *See also Marcus*, 317 U.S. at 551. Any incidental effect of punishing the defendant is not enough to make a statute "penal" in the survival context. *See Grannis*, 172 F.2d at 515. *See also, e.g.*, *Hudson v. United States*, 522 U.S. 93, 102 (1997) (noting that all civil penalties carry some deterrent effect).

By contrast, courts have held that government claims abate where the statutes do **not** seek to compensate it for monetary harm. For instance, a violation of a price control regulation does not "compensate for an injury to the United States," because the injured party is the person who bought the item in excess of the legally-mandates price was the one harmed. *See United States v. Price*, 290 F.2d 525, 526, 527 (6th Cir. 1961) (per curiam). *See also, e.g.*, *Schreiber*, 110 U.S. at 79-80 (holding that copyright plaintiff's qui tam suit to recover statutory penalties, rather than actual damages, abated on defendant's death).

The monetary harm the government suffers need not be precisely quantifiable for a claim to be remedial. To be sure, the False Claims Act and

---

recovery as distinguished from imposition of penal exactions"). *See also* 77 Cong. Rec. 6164 (1933) (statement of Rep. Sumners) ("This bill is intended merely to preserve the right of the United States to pursue under its judgment the estate of the person against whom the judgment is rendered and who since such rendition has died."). It thus supports the idea that survival of a claim should turn on the award will compensate the United States for some monetary harm.

U.S. Opp. Mot. Dismiss – p. 6

Surplus Property Act each tie damages to the monetary harm the government suffered. But the Supreme Court has long held, albeit not in the survival context, that no such anchor is needed to make a statute remedial. In *Stockwell v. United States*, 80 U.S. (13 Wall.) 531, 546-47 (1871), the Court held that a statute requiring illegal importers to "forfeit and pay a sum double the amount or value of the goods" was remedial. In other words, the award to the government was tied to the value of the goods, not to the duty on the goods. Similarly, in *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 233 n.2 (1972), the Court considered a statute stating that undeclared imported goods "shall be subject to forfeiture and [the importer] shall be liable to a penalty equal to the value of such article." The statute was remedial because it "prevents forbidden merchandise from circulating in the United States, and, by its monetary penalty, it provides a reasonable form of liquidated damages for violation of the inspection provisions and serves to reimburse the Government for investigation and enforcement expenses." *Id.* at 237. Lower courts have likewise recognized this principle. Recently, the District Court for the District of Columbia held that a penalty under the Internal Revenue Code for failing to file a form reporting an interest in a foreign corporation was remedial, and therefore not subject to the Excessive Fines Clause of the Eighth Amendment—even though the taxpayer was not liable for any unpaid taxes. *See Dewees v. United States*, 272 F. Supp. 3d 96, 99, 100-01 (D.D.C. 2017).

      Finally, in the closest analogue to the FBAR penalty, the Supreme Court held that a 50% penalty imposed for committing income tax fraud is remedial. *Helvering v. Mitchell*, 303 U.S. 391, 399-401 (1938). The penalty was "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Id.* at 401. *Mitchell* is particularly significant because numerous courts have interpreted it to mean that the 50% fraud penalty may still be asserted after a

U.S. Opp. Mot. Dismiss – p. 7

taxpayer's death. *See, e.g.*, *Lee v. Commissioner*, 227 F.2d 181, 183 (5th Cir. 1955); *Kirk v. Commissioner*, 179 F.2d 619, 621 (1st Cir. 1950). They expressly track *Mitchell*'s reasoning in deciding that the fraud penalty survives because it compensates the government—even though it is an addition to the tax the taxpayer sought to avoid. *See Kirk*, 179 F.2d at 621-22; *Reimer's Estate v. Commissioner*, 12 T.C. 913, 920-21 (1949), *aff'd*, 180 F.2d 159 (6th Cir. 1950) (per curiam).

In short, when the government is the plaintiff, the claim survives if the pecuniary sanction will compensate the government for some loss. The sanction need not be tied to the amount of the loss, and may be remedial if it serves to compensate the government for the cost of investigation. That describes the FBAR penalty.

B.  **The FBAR Penalty Serves a Remedial Purpose.**

Like the tax fraud penalty, the FBAR penalty serves an important remedial purpose. It helps to reimburse the United States for tax revenue lost through secret offshore financial accounts, as well as the costs of investigating those accounts. As Congress stated when it enacted the Bank Secrecy Act, the "debilitating effects" of secret offshore banking "are vast. It has been estimated that hundreds of millions in tax revenues have been lost." H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. at 4397. Congress even endorsed a description of "the secret foreign bank account as the largest single tax loophole permitted by American law." *Id*. at 4398. Cases involving offshore accounts can be "in the investigative stage for years," involving "a time consuming and oftimes fruitless foreign legal process." *Id*. at 4397.

Congress reiterated those problems in 2004, when it increased the penalties for willful FBAR violations and added, for the first time, a penalty for non-willful failures to file. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1418, 1586 (codified at 31 U.S.C. § 5321). The legislative history for the

U.S. Opp. Mot. Dismiss – p. 8

2004 amendments explains that "the number of individuals involved in using offshore bank accounts to engage in abusive tax scams has grown significantly in recent years," and that improving FBAR compliance was "vitally important to sound tax administration." S. Rep. 108-192 (2003), at 108. Congress also relied in part on a report by the Secretary of the Treasury. *See id.* at 108 & n. 194. That report noted that obtaining information from foreign jurisdictions by treaty was not always possible—and when it was available, getting it "is often a cumbersome, time-consuming process." Treasury Department, *Report to Congress in Accordance with § 361(b) of the USA PATRIOT Act of 2001*, at 8 (Apr. 26, 2002). *See also id.* at 11 (noting that using administrative summonses to obtain information from certain tax haven jurisdictions "can be prohibitively difficult and time consuming"); *United States v. Garrity*, No. 3:15-cv-243(MPS), 2019 WL 1004584, at *8-*9 (D. Conn. Feb. 28, 2019) (rejecting argument that government was not harmed by FBAR violation).

The FBAR penalty is not tied to the government's loss in a particular case, but it need not be in order to be "remedial." *See United States v. Bajakajian*, 524 U.S. 321, 342-43 (1998) (quoting *Stockwell*, 80 U.S. (13 Wall.) at 546, and distinguishing early customs statutes providing for forfeiture of goods as remedial). As the Supreme Court has observed, "[T]he Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas . . . without being deemed to have imposed a second punishment for the purpose of double jeopardy analysis." *United States v. Halper*, 490 U.S. 435, 446 (1989).[2] Courts have repeatedly held that the tax fraud penalty achieves rough

---

[2] *Halper*'s Double Jeopardy Clause analysis was abrogated by *Hudson v. United States*, 522 U.S. 93 (1997), which rejected *Halper*'s requirement that a sanction must be solely remedial to avoid implicating the Double Jeopardy Clause. *Halper*'s observation that remedial sanctions can constitute rough justice remains apt.

U.S. Opp. Mot. Dismiss – p. 9

remedial justice. *See, e.g.*, *Thomas v. Commissioner*, 62 F.3d 97, 100-01 (4th Cir. 1997); *Louis v. Commissioner*, 170 F.3d 1232, 1235-36 (9th Cir. 1999).

Similarly, even if the FBAR penalty also deters non-compliance, it still serves a remedial purpose. *See Kirk*, 179 F.2d at 621 (noting that tax fraud penalty deters fraud, but is remedial). "[A]ll civil penalties have some deterrent effect." *Hudson*, 522 U.S. at 102. That does not mean they are not remedial. If some deterrent effect were enough to prevent a penalty from being "remedial," the Supreme Court's decision in *Marcus* would have come out the other way. *See Marcus*, 317 U.S. at 551.

The Greens correctly point out that the FBAR penalty is not dischargeable in bankruptcy because it is "a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." 11 U.S.C. § 523(a)(7). *See United States v. Simonelli*, 614 F. Supp. 2d 241, 247 (D. Conn. 2008). Dischargeability in bankruptcy is a different question from the one presented here. *Simonelli* correctly held that the FBAR penalty is a "penalty" under § 523(a)(7)—but that court had no occasion to consider whether it is a penalty with a remedial purpose, which it is.[3]

---

[3] The *Simonelli* court did not consider in detail whether the FBAR penalty was compensation for an "actual pecuniary loss," and thus fell outside the ambit of 11 U.S.C. § 523(a)(7). *See* 614 F. Supp. 2d at 243 n.4 ("Defendant . . . does not claim that his debt is 'compensation for actual pecuniary loss.'"). This Court, of course, need not decide that issue either. Notably, though, even a remedial penalty that is generally intended to defray the government's costs can fall within § 523(a)(7) if the penalty is not specifically derived from a showing of actual loss. *See United States v. WRW Corp.*, 986 F.2d 138, 145 (6th Cir. 1993) (concluding that penalty under the Federal Mine Safety and Health Act was "not compensation for actual pecuniary loss even though it is rationally related to the goal of making the Government whole by roughly compensating it for prosecutorial and investigative expenses"). *Cf. Disciplinary Bd. of Penn. v. Feingold (In re Feingold)*, 730 F.3d 1268, 1275-76 (11th Cir. 2013) (holding that judgment against attorney to compensate disciplinary

The FBAR penalty achieves rough justice in several ways. It ties the maximum penalty to the size of the unreported balance, and it permits the Secretary of the Treasury to choose a lower penalty as the circumstances warrant. *See* 31 U.S.C. § 5321(a)(5)(B), (C). The penalties reflect Congress's determination of the monetary value of the harm to the government that results from a willful violation of the FBAR requirement: The greater the balance in a secret offshore account, the greater the potential for tax evasion. The FBAR penalty can also serve as a form of liquidated damages for uncollectible tax revenue. In this case, for instance, Marie Green opened a secret offshore bank account in 1988, more than a quarter-century before she reported it to the IRS. (*See* Compl. ¶ 14 (Dkt. 1).) Given limited resources, as well as the difficulty of collecting old documents from offshore banks, the government cannot pursue unreported income to the beginning of every account. The FBAR penalty allows it roughly to recoup that loss.

The Middle District of Florida recently concluded that the FBAR penalty is remedial, and thus survives. In *Estate of Schoenfeld*, the court applied the factors set out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). *See* 344 F. Supp. 3d at 1369-73. The Greens are correct that those factors were developed in the context of determining whether the statute at issue was civil or criminal. *See Kennedy*, 372 U.S. at 167-68. However, that does not mean they are irrelevant. The Ninth Circuit, for instance, has found the factors persuasive in determining whether a particular sanction survives the wrongdoer's death. *See, e.g.*, *$84,740*, 981 F.2d at 1113; *Reiserer v. United States*, 479 F.3d 1160, 1162-64 (9th Cir. 2007) (holding that penalties for promoting abusive tax shelters under I.R.C. §§ 6700 and 6701 survived attorney's death). The Court need not apply the *Kennedy* factors. As

---

board for years of litigation was not dischargeable because general purpose of imposing costs was penal in nature).

U.S. Opp. Mot. Dismiss – p. 11

explained above, there are other indicia that the FBAR penalty is remedial. But if the Court finds the factors useful, it should apply them in the same way the *Estate of Schoenfeld* court did, and reach the same conclusion.

Like the tax fraud penalty, *see Mitchell*, 303 U.S. at 401, the FBAR penalty serves an important remedial function. In addition to deterring tax fraud through the use of secret offshore bank accounts, it roughly compensates the government for the cost of investigating those accounts and for tax that will go uncollected. It survives the accountholder's death. *Estate of Schoenfeld*, 344 F. Supp. 3d at 1370, and *Park*, 389 F. Supp. 3d at 575, were correctly decided. This Court should join them in holding that the FBAR penalty survives the accountholder's death.

## II. The United States' Complaint States a Plausible Claim for Relief.

The Greens next argue that the Complaint fails to state a plausible claim upon which relief may be granted. That argument is likewise unavailing. The United States filed this action seeking a judgment for civil penalties assessed against Marie Green for her willful failure to file an FBAR for 2010 and 2011. In order to be subject to the penalties, Marie Green must (1) have been a U.S. citizen; (2) with an interest in or authority over a foreign financial account; (3) that account had a balance that exceeded $10,000 at some point during the reporting person; and (4) she willfully failed to disclose the account and file an FBAR for the account. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a); *see also United States v. Schwarzbaum*, No. 18-cv-81147-BLOOM/Reinhart, 2019 WL 3997132, at *3 (S.D. Fla. Aug. 23, 2019). The Greens take issue only with the willfulness prong.

### A. *The United States Can Prove Marie Green's Willfulness through Circumstantial Evidence.*

Initially, the Greens' contention that the Complaint fails to plausibly allege the requisite mental state, *i.e.*, willfulness, is based on a misapplication of *Twombly*

and *Iqbal*. Where, as here, willfulness is a statutory condition of civil liability, the Supreme Court has taken it to "cover not only knowing violations of a standard, but reckless ones as well.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). This is true in the civil FBAR context.[4] *See, e.g.*, *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019); *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018); *United States v. Williams*, 489 Fed. App'x 655, 658–59 (4th Cir. 2012); *United States v. Garrity*, 304 F. Supp. 3d 267, 274 (D. Conn. 2018). "Willfulness does not require actual knowledge of the duty to report interest in a foreign financial account, but merely reckless or careless disregard of that statutory duty." *United States v. Brandt*, 2018 WL 1121466, at *4 (S.D. Fla. Jan. 24, 2018). Recklessness is an objective standard that involves "an unjustifiably high risk of harm that is either known or so obvious that it should have been known." *Safeco*, 551 U.S. at 68; *see also Schwarzbaum*, 2019 WL 3997132, at *3.

"An improper motive or bad purpose is not necessary to establish willfulness in the civil context." *United States v. McBride*, 908 F. Supp. 2d 1186, 1205 (D. Utah 2010). "Specific to FBAR cases, willfulness in the context of violations of § 5321 'may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information, and it can be inferred from a conscious effort to avoid learning about reporting requirements.'" *Norman v. United States*, 138 Fed. Cl. 189, 192 (2018), *aff'd*, 942 F.3d 1111 (Fed. Cir. 2019) (quoting *Williams*, 489 Fed. App'x at 658)). In other words, "willful intent may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available." *McBride,* 908 F. Supp. 2d at 1205. Direct

---

[4] The Greens concede for the purpose of their motion that willful violations of FBAR reporting requirements encompass a recklessness standard.

U.S. Opp. Mot. Dismiss – p. 13

evidence of a person's mental state or intent is not required to prove a willful FBAR violation.

Nevertheless, the Greens rely on *Twombly* and *Iqbal* for the proposition that the government must provide direct evidence of Marie Green's mental state and that allegations of conduct evincing willfulness is insufficient. They are wrong. In *Twombly*, the Supreme Court specifically considered whether the plaintiffs in a putative class action stated a plausible claim that the defendants were engaged in a conspiracy to violate § 1 of the Sherman Act, which prohibits unreasonable restraint of trade "effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553. Thus, the "crucial question" in *Twombly* was whether the defendants' actions stemmed from an agreement to restrain trade. *Id.* The Court found that "when allegations of parallel [business] conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Because the alleged conduct could be the result of coincidence, rather than collusion, the plaintiffs failed to state a plausible claim for relief. *Id.* at 544.

Similarly, in *Iqbal*, the Supreme Court considered whether Iqbal's complaint plausibly stated a claim that Attorney General Ashcroft and Director Mueller adopted post-September 11 unconstitutional detention policies that subjected him to arrest and harsh conditions of confinement based on discriminatory criteria. *Iqbal*, 556 U.S. at 666. To support his claim, Iqbal was required to demonstrate that the policy was adopted "not for a neutral, investigative reason, but for the *purpose* of discriminating on account of race, religion, or national origin." *Id.* at 677 (emphasis added). Like *Twombly*, the Supreme Court found that Iqbal's allegations gave rise to "an obvious alternative explanation"—the arrests were likely lawful and justified by the FBI's "nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connection to those who committed

terrorist acts." *Id.* at 682. Thus, given "more likely explanations," invidious discrimination was not a plausible conclusion. *Id.* at 681.

Here, *Twombly* and *Iqbal* require the United States to plead sufficient circumstantial facts that, taken as true, suggest that Marie Green recklessly or knowingly disregarded her FBAR filing requirements. The pleading standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal" further evidence. *Twombly*, 550 U.S. at 556. That standard is met here. While the Greens claim that Marie Green's actions are "merely consistent" with behaving willfully, they fail to establish any obvious alternative explanations for those actions. (Mot. 9 (Dkt. 13).) And in fact, the allegations in the Complaint would easily allow a reasonable fact-finder to infer that Marie Green acted recklessly or knowingly when she failed to file FBARs.

### B. The Circumstances Alleged in the Complaint Establish that Marie Green's Failure to File FBARs was Willful.

Taken as true and construed in the light most favorable to the government, *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008), the allegations in the Complaint establish a more than plausible claim that Marie Green recklessly or knowingly failed to file FBARs for 2010 and 2011.

To begin with, Marie Green failed to timely report or pay tax on more than $1.4 million in income she received in her foreign accounts from 2005 through 2011. (Compl. ¶ 55 (Dkt. 1).)[5] The Court does not "scrutinize each allegation in isolation but . . . assess[es] all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The fact Marie Green failed to pay tax on income in the accounts colors all of the other allegations in the Complaint. It

---

[5] The Complaint contains a typographical error in paragraph 55—it should read $1.4 million, not $1.7.

U.S. Opp. Mot. Dismiss – p. 15

suggests a clear incentive—tax evasion—for her to keep the accounts secret from the Internal Revenue Service. *See Williams*, 489 Fed. App'x at 658 (stating that "willfulness may be proven through inference from conduct meant to conceal or mislead sources of income") (citation and internal quotation marks omitted); *McBride*, 908 F. Supp. 2d at 1212 ("At the very least, McBride must have been reckless as to the consequences of failing to report or disclose income sources, and therefore reckless as to whether or not his failure to report income would also result in a failure to comply with the FBAR requirements.").

And keep them secret she did. With respect to one account, Marie Green and her family had long held an account in the name "Acuva Bat Itzhak," even though it was their personal account. (Compl. ¶ 15-16 (Dkt. 1).) She asked the bank to honor instructions that did not contain her name and to hold mail, rather than transmit it to the United States. (*Id.* ¶ 18.) A reasonable fact-finder could construe these facts as showing that Marie Green was deliberately concealing the account from the U.S. government. *See, e.g.*, *United States v. Rum*, No. 8:17-CV-826-T-35AEP, 2019 WL 3943250, at *1 (M.D. Fla. Aug. 2, 2019) (citing IRS agent declaration that "withholding mail helps avoid disclosure of foreign bank accounts to the IRS"), *report and recommendation adopted*, No. 8:17-CV-826-T-35AEP, 2019 WL 5188325 (M.D. Fla. Sept. 26, 2019), *appeal docketed*, No. 19-14464 (11th Cir.).

Later, a Panama entity with nearly the same name, "Acuva Bath Itzhak Corp.," was formed on Marie Green's behalf. There was no business reason for it to be created. (*Id.* ¶ 22-23.) Acuva Bath Itzhak told a Swiss bank that Marie Green was the beneficial owner of the account (*id.* ¶ 26)—but it **also** told the bank that the corporation was the beneficial owner "for the purposes of the U.S. Withholding Tax regulations" (*id.* ¶ 28). A reasonable fact-finder could construe these facts as showing that Marie Green deliberately hid her ownership in order to avoid having to pay federal income tax on income in the account. *See United States v. Pomerantz*,

U.S. Opp. Mot. Dismiss – p. 16

No. C16-689 MJP, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017) ("The court can plausibly infer an intent to evade the foreign bank account reporting requirement based on the creation of foreign bank accounts in the name of a shell company.") (quoting previous order in same case); *Norman*, 942 F.3d at 1116 (stating that opening foreign account as "numbered account," which does not contain the accountholder's name or address, has effect of inhibiting disclosure of account to the IRS).

Similarly, Templaide Associates, a Panama entity, was formed on Marie Green's behalf for no business purpose. (Compl. ¶¶ 31-32 (Dkt. 1).) Marie Green was one of the people who controlled the company. (*Id.* ¶ 35.) In acquiring a financial account, Templaide made a false statement to an Israeli bank, claiming that no U.S. person had an interest in the account, when in fact Marie Green did. (*Id.* ¶¶ 33-35.) The funds in that account were eventually transmitted to an account at Mercantile Discount Bank that has **never** been reported on an FBAR (*id.* ¶ 38), even though Marie Green undeniably learned—at some point—about the filing requirements (*see id.* ¶ 49). A reasonable fact-finder could conclude that Marie Green continued to hide assets, even after disclosing some of them—and infer from her continued behavior that she had intentionally hid accounts all along.

The Greens argue that there is something to be gleaned from the fact that the Complaint's allegations do not always specifically allege affirmative acts by Marie Green. Instead, some acts, like the creation of Acuva Bath Itzhak Corp., were done "on her behalf." (*See* Compl. ¶ 22 (Dkt. 1).) There is less to that distinction than meets the eye. The United States does not **know** that Marie Green directed Acuva Bath to be created. However, consider the other allegations: it had no business purpose; it owned a foreign bank account she failed to report; Marie Green was the beneficial owner of the assets in the account; the company made a false statement

to a bank. (*Id.* ¶¶ 24-28.) A reasonable inference is that Marie Green directed the creation of the entity or that someone acting as her agent did so.

Similarly, the Greens' suggestion there is no liability because Marie Green relied on the direction of attorneys, bankers, and relatives in handling her banking affairs (Mot. 2 (Dkt. 13)), or because she was advanced in age (*id.* at 12), is of no consequence. Any such defense is not properly before the Court at the motion to dismiss stage. *See Hudson Drydocks, Inc. v. Wyatt Yachts, Inc.*, 760 F.2d 1144, 1146 n.3 (11th Cir. 1985) ("An affirmative defense may be raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim, but only if the defense is apparent on the face of the complaint."). And reliance on an advisor would not excuse failing to file the FBAR if the reliance was not reasonable. As discussed below, the Complaint presents no other plausible explanation for Ms. Green's actions—her conduct unequivocally demonstrates that her failure to timely file FBARs was willful.

Taken together, the allegations in the Complaint are sufficient to support a plausible inference that Marie Green willfully failed to disclose those accounts. Indeed, they show a concerted effort to conceal her foreign accounts and income from the government. The Motion to Dismiss should be denied.

C. *In the Alternative, the Court Should Permit the United States to Amend the Complaint.*

For the reasons stated above, the United States has alleged a plausible claim for relief, and the Motion to Dismiss should be denied. But even if the Court disagrees, it should grant the United States leave to amend its Complaint. "The court should freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a). And the Supreme Court has explained that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief," and there is no particular reason to deny leave to amend, then "the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182

U.S. Opp. Mot. Dismiss – p. 18

(1962). Accordingly, if the Court agrees that the United States needs to sharpen its factual allegations, it should permit the United States to amend its complaint within 14 days of the Court's order.

### III.  Conclusion

The FBAR penalty survived Marie Green's death because it serves a remedial purpose. And the facts alleged in the Complaint plausibly show that Marie Green willfully failed to file FBARs for 2010 and 2011. The Court should deny the Motion to Dismiss or, if the Court believes the factual allegations are insufficiently specific, grant the United States leave to amend.

Respectfully submitted this 9th day of December, 2019.

>RICHARD E. ZUCKERMAN
>Principal Deputy Assistant Attorney General
>
> /s/ Adam Strait
>ADAM D. STRAIT (Mass. BBO No. 670484)
>MARGARET S. SHOLIAN (Wash. Bar No. 51444)
>Attorneys, Tax Division
>U.S. Department of Justice
>P.O. Box 14198
>Washington, D.C. 20044
>Telephone:   (202) 307-2135 (Strait)
>Telephone:   (202) 514-5900 (Sholian)
>Facsimile:   (202) 514-4963
>adam.d.strait@usdoj.gov
>margaret.s.sholian@usdoj.gov
>
>*Of Counsel:*
>ARIANA FAJARDO ORSHAN
>U.S. Attorney, Southern District of Florida
>
>*Attorneys for the United States of America*

**Certificate of Service**

I certify that on December 9, 2019, I filed the foregoing document with the Court through the Court's CM/ECF system. Pursuant to Local Rule 5.1 and Federal Rule of Civil Procedure 5(b)(2)(E), the electronic filing caused the document to be served upon:

    Jeffrey A. Neiman (jneiman@mnrlawfirm.com)

    Derick R. Vollrath (dvollrath@mnrlawfirm.com)


Date: December 9, 2019

                                              /s/ Adam Strait
                                              Adam D. Strait
                                              Attorney, Tax Division
                                              U.S. Department of Justice