**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>vs.<br><br><br>JACQUILINE D. GREEN, as Personal Representative of the Estate of Marie Green and as Co-Trustee of the Marie Mary Green Revocable Trust; BERT GREEN, as Co-Trustee of the Marie Mary Green Revocable Trust,<br><br>*Defendants*. | **CASE NO. 19-24026-CIV-MOORE** |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION**
**TO DISMISS FOR FAILURE TO STATE A CLAIM**

*[Intentionally Bank—Reply Begins on Next Page]*

1

Defendants Jacqueline and Bert Green file this Reply in further support of their Motion to Dismiss the Government's Complaint [DE 13]. This Reply is organized in two parts. First, it addresses issues related to whether the FBAR penalty abated upon Marie Green's death. Second, it addresses the Government's failure to sufficiently plead FBAR willfulness under Federal Rule of Civil Procedure 8(a).

## THE FBAR PENALTY'S ABATEMENT UPON DEATH

**I.     The Government properly retreats from the "civil vs. criminal" double jeopardy standard in *Hudson v. United States* that mars the Middle District of Florida's *Schoenfeld* decision.**

As a preliminary matter, the Government appears to properly recede from its position in *United States v. Schoenfeld*, 344 F. Supp. 3d 1354 (M.D. Fla. 2018) that the double-jeopardy analysis articulated in *Hudson v. United States*, 522 U.S. 93 (1997) supplies the rule of decision in this case. [DE 16 at 2, 11.] Applying *Hudson*, the Middle District of Florida in *Schoenfeld* evaluated whether the civil FBAR penalty was "so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Schoenfeld*, 344 F. Supp. 3d at 1370 (quoting *Hudson*, 522 U.S. at 99–100). But *Hudson* does not supply the appropriate standard. There is instead a controlling Eleventh Circuit case that does: *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir. 1993). [DE 16 at 2 (recognizing *NEC Corp.* as the primary authority on a claim's survival).] Per *NEC Corp.*, the question is not whether a civil penalty is so punitive that it is, in effect, a criminal sanction. Rather, the key issue is whether the sanction— even a civil sanction—serves a primarily remedial or penal purpose.

*NEC Corp.* articulates "three factors" that a court should examine "[i]n deciding whether a statute is penal or remedial" for purposes of abatement upon death. *NEC Corp.*, 11 F.3d at 137. These factors are as follows: "(1) whether the purpose of the statute was to redress individual

2

wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Id.* (cleaned up). A claim's survival turns on "whether the recovery is deemed 'remedial' or 'penal'" in light of these factors. *Id*. Both parties acknowledge that remedial actions survive the death of a party while penal ones do not. [*See* DE 16 at 2.]

*Schoenfeld* fails to properly apply the Eleventh Circuit's binding *NEC Corp*. decision. It is therefore poor precedent in this case. The same holds true for the other case that the Government urges the Court to follow: the Northern District of Illinois's decision in *United States v. Park*, 389 F. Supp. 3d 561 (N.D. Ill. 2019). *Park* does not cite *NEC Corp.* at all and instead relies upon *Schoenfeld*'s flawed analysis. *See Park*, 389 F. Supp. 3d at 575.

**II.     Whether a claim is "remedial" or "penal" for survivability turns on its *primary* purpose.**

Having established that *NEC Corp.* controls this case, an important point bears emphasizing. A claim can have some remedial aspects and still be "deemed penal" under *NEC Corp.*, and vice versa. What matters is the claim's *primary* purpose. If a claim "does not fall neatly within the common law categories of either a penalty or remedial action" courts should determine the claim's "primary purpose." *In re Wood*, 643 F.2d 188 (5th Cir. 1980). *Accord Bradley v. Franklin Collection Servcs.*, 2012 WL 12895015, at *4–5 (N.D. Ala. Apr. 10, 2012) (conducting *NEC Corp.*'s survivability analysis and looking to the claim's "primary purpose").

Thus, it is not sufficient for the Government to demonstrate that the FBAR penalty serves *some* remedial purpose for the claim to survive Marie Green's death. Rather, the Government must show that the FBAR penalty was intended *primarily* to compensate the Government for harm rather than to encourage compliance with the FBAR Reporting requirements. As set forth below, the opposite is true. As the Internal Revenue Service's own manual acknowledges, "The purpose

3

of FBAR penalties is to promote compliance with the FBAR reporting and recordkeeping requirements." Internal Revenue Manual § 4.26.16.6.4.[1] That the FBAR penalty may also serve some remedial purpose is not enough to save it from abating upon Marie Green's death.

**III.     The FBAR Penalty's primary purpose is penological: it deters noncompliance with the FBAR Reporting Requirements and bears little-to-no relation to any harm to the Government.**

The penal nature of the FBAR penalty should not be controversial. The Government in its Response argues that it can be an injured party for purposes of the *NEC Corp.* analysis. This is of course correct. The Eleventh Circuit's *NEC Corp.* decision itself concerned the survival of a False Claims Act action, which compensates the government for payments made due to fraud or other misrepresentation. 11 F.3d at 137 ("The government's recovery against an FCA defendant is intended to compensate the government for damages suffered as a result of the defendant's actions.")[2]

But compensating the United States for harm suffered is **simply not what the FBAR penalty does**. As the Government acknowledges, "[a] valid claim for willful FBAR violation requires the following showing: '(1) the person must be a U.S. Citizen; (2) the person must have or have had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period;[3] and (4) the person must

---

[1] The Treasury Department's Internal Revenue Manual is publicly available online at http://irs.gov/irm.

[2] In light of this, the Governments assertion in its Response that *NEC Corp.*'s factors "do not allow for[] a situation where the United States itself suffered a pocketbook injury as a result of the defendant's conduct" [DE 16 at 4] seems off-base. *NEC Corp.* applied these factors in precisely such a situation.

[3] This formulation is inexact as to two points. Most importantly, the law looks to the aggregate high balance of all an individual's foreign accounts. If that aggregate balance exceeds $10,000, then the individual must disclose all of his foreign accounts even if a given account's balance

4

have willfully failed to disclose the account and file a[n] FBAR." [DE 13 at 10 (quoting *United States v. Schwarzbaum*, Case No. 18-81147-CIV, 2019 WL 3997132, at *3 (S.D. Fla. Aug. 23, 2019)].

Crucially, **no harm is required at all**. Indeed, the FBAR penalty applies even if a person reports on his US Tax Return every dollar of income that his undisclosed account generates and pays the resulting tax. Likewise, the penalty applies if the account generates no taxable income at all. Rather, FBAR penalties do exactly what the Treasury Department's Internal Revenue Manual says: "promote compliance with the FBAR reporting and recordkeeping requirements." Internal Revenue Manual § 4.26.16.6.4. They do so regardless of tax loss.

The *NEC Corp.* factors support this conclusion. Considering the first and second factors, the FBAR penalty addresses a wrong to the public at large and is paid to the state, rather than to any wronged individual. An FBAR violation does not harm the Government's pocketbook, like a False Claims Act violation or tax fraud might. Instead, a violation deprives the Government's Financial Crimes Enforcement Network ("FinCEN") only of information. And FinCEN is not entitled to this information in its capacity as just another private actor within a marketplace. Rather, it collects this information in its sovereign, public capacity. Evaluation of the first and second *NEC Corp.* factors accordingly strongly weigh in favor of finding that an FBAR penalty is a penalty for purposes of abatement upon death.

The third *NEC Corp.* factor also supports the conclusion that the FBAR penalty abates upon death of the alleged wrongdoer. The willful FBAR penalty is "wholly disproportionate" to any harm a defendant causes the Government. The penalty for a willful FBAR violation is equal

---

never exceeded $10,000. Second, even non-citizen U.S. residents and other "U.S. Persons" have FBAR reporting obligations.

to the greater of $100,000 or half of the account's balance on the FBAR's June 30 filing deadline. This penalty scheme allows for some remarkable results.

Consider the following (not all that uncommon) situation: a newly made US Citizen grew up in England and moved to the United States at age 50. That individual has lived a substantial time overseas and has accumulated eleven English financial accounts.[4] Most of the accounts are inactive. But he maintains about $11,000 in a non-interest-bearing checking account that he uses to provide for his now-elderly parents who have remained in England. His first year of his citizenship, he pays his taxes but disregards the FBAR filing requirement. As a result, he is subject to a $1.1 million FBAR penalty—$100,000 for each of his eleven undisclosed accounts. This penalty is far disproportionate to any conceivable harm that his FBAR violation has caused the government. Indeed, the violation causes **no** pecuniary harm. That is because it exists not to compensate for any harm, but to deter noncompliance with reporting obligations.

As Defendants note in their initial brief, the court in *United States v. Simonelli* properly observes the FBAR penalty's penal nature. 614 F. Supp. 2d 241 (D. Conn. 2008). "Defendant's failure to file an FBAR was a wrong to the state; while Defendant's omission violated 31 U.S.C. § 5314, it resulted in no injured private party and no pecuniary harm, either to a private party or to the state. The FBAR penalty is assessed on Defendant as a punishment, not as any sort of compensation for pecuniary harm." *Id.* at 247. Accordingly, the FBAR penalty abated upon Marie Greens' death.[5]

---

[4] This is not an unrealistic number, considering checking, savings, credit card, life insurance, loan, and corporate accounts—and that individuals rarely close accounts even if they move to a new bank.

[5] Other statutes compensate the Government for pecuniary harm. Notably, the Government has assessed back taxes and Revenue Code penalties of more than $700,000 against Marie Green's Estate, and Marie Green's Estate has paid them all. The FBAR penalty that the Government

**IV.     The Government's argument that the FBAR penalty's primary purpose is to compensate the Government for tax loss and investigation costs rings hollow.**

Next, this Reply will address two specific arguments that the Government makes in its response. First, it will address the Government's argument that the FBAR penalty compensates for a tax loss, akin to the fraudulent-underpayment-of-tax-penalties levied by 26 U.S.C. § 6663. Second, it will address the Government's argument that the FBAR penalty compensates the Government for the costs of its investigation into FBAR violations.

On pages seven through ten of its Response, the Government argues that the FBAR Penalty is remedial because it roughly compensates the Government for a tax loss that it may potentially experience as a result of an individual's failure to file an FBAR form. In so doing, the Government relies upon *Helvering v. Mitchell*, 303 U.S. 391 (1938) and *Kirk v. Commissioner*, 179 F.2d 619, 621 (1st Cir. 1950). In *Mitchell*, the United States Supreme Court held that the Internal Revenue Code's fraud penalty was remedial for the purposes of double jeopardy analysis. The First Circuit in *Kirk* translated that analysis to the question of whether the fraud penalty survived the death of a taxpayer. 179 F.2d at 621. The key portion of the First Circuit's *Kirk* decision is reproduced below:

> [I]t is true, as the petitioner emphasizes that the *Mitchell* case raises no question of the survival of the statutory assessment for fraud. Moreover, it is also true that it was only necessary to the decision of the issues raised in that case for the Supreme Court to hold that the fraud assessment was not intended by Congress as a criminal penalty—the question whether it was intended to be a civil penalty, that is, an exaction in the way of punishment enforceable in a civil action, not being involved.
>
> **But the court in the course of holding that the assessment was not a criminal penalty, went further and said that the assessment was not a penalty at all**, stating categorically that 'The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the

---

seeks in this action amounts to an additional $2.1 million, far disproportionate to any harm the Government has suffered.

>revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. And, following this, it said, quoting *Stockwell v. United States*, 13 Wall. 531, 547, 551, 10 L.Ed. 491, 'It must therefore be considered as remedial, as providing indemnity for loss.'

*Kirk v. Comm'r*, 179 F.2d 619, 621 (1st Cir. 1950) (emphasis and paragraph break added). The *Kirk* Court felt bound by the Supreme Court's conclusion as to the Revenue Code's fraud penalty. *Id.* at 621 ("[I]n the face of the language of the Supreme Court in the *Mitchell* case, we do not feel at liberty to characterize the fraud addition as anything but remedial.") It did so even though the petitioner "ma[de] a plausible, even forceful argument for the proposition that the fraud addition was intended by Congress as a personal punishment for taxpayers guilty of fraud on the revenue." *Id.* at 620.

The Government's reliance upon these cases breaks down, however, because the FBAR penalty is nothing like the IRC's fraud penalty. Most importantly, unlike the fraud penalty, the FBAR penalty does not require a showing of fraud or of any tax loss to the Government at all.[6] In fact, where such a loss exists, the very fraud penalty at issue in *Mitchell* and *Kirk* compensates the Treasury for its injury. The FBAR penalty is separate from and additional to these penalties. The FBAR penalty is not part of the Internal Revenue code. Rather, it is part of the Bank Secrecy Act.[7] It is not designed to compensate for loss. Instead, it is designed to incentivize compliance with the FBAR's filing requirements. To the extent the Government believes it has suffered a tax loss, the

---

[6]   The Internal Revenue Code's fraud penalty is codified at 26 U.S.C. § 6663. Unlike the FBAR penalty, it requires a showing of an "underpayment of tax" that is "due to fraud." *Id.* at § 6663(a). And the amount of the fraud penalty is pegged to the tax loss. It results in an amount equal to 75% of the underpayment being "added to the tax." *Id.*

[7]   Rather, the FBAR penalty is part of the Bank Secrecy Act, a finance-system regulation found in Title 31 of the U.S. Code. The FBAR filing requirement is authorized by 31 U.S.C. § 5314 and appears at regulation 31 C.F.R. § 1010.350.  The willful FBAR penalty is authorized by 31 U.S.C. § 5321(a)(5)(C) and appears at 31 C.F.R. §1010.820.

8

IRS may pursue the IRC § 6663 fraud penalty. And even if the Government believes it has suffered no tax loss at all, it may pursue an FBAR penalty should the circumstances warrant it.

Second, the Government argues that the FBAR penalty is remedial because it compensates the Government for its costs of investigation. But this argument is circular. The enforcement of every penalty entails investigation and prosecution costs. If these costs were permitted to render the penalty itself remedial, it would effectively swallow the rule that penal actions abate upon death. Every penalty would simply be remedial because the penalty would compensate the Government for the costs of enforcing that penalty. Perhaps recognizing this, the Government argues that the FBAR penalty defrays the costs of enforcing an individual's compliance with their separate tax obligations. But this argument likewise fails. As observed at length above, an FBAR violation requires no showing of any tax loss at all. And the Supreme Court in *Mitchell* has observed that the IRC's fraud penalty already serves this compensatory purpose.

Finally, it bears repeating that the relevant inquiry for abatement is a penalty's *primary* purpose. Even if the Court concludes that the FBAR penalty serves in part to compensate the Government for tax loss or to defray investigation costs, the penalty should still abate upon death. The FBAR penalty's *primary* purpose remains to incentivize compliance with the FBAR reporting requirement—a penal, deterrent aim. *See*, Internal Revenue Manual § 4.26.16.6.4 ("The purpose of FBAR penalties is to promote compliance with the FBAR reporting and recordkeeping requirements.").

## **THE GOVERNMENT'S FAILURE TO PLAUSIBLY PLEAD FBAR WILLFULNESS**

### I.     The Government misconstrues Defendants' reading of *Twombly* and *Iqbal*.

The Government's initial points in opposition to Defendants' Rule 8(a) argument appear based upon a misreading of Defendant's Motion. Defendants do not argue that the "the government must provide direct evidence of Marie Green's mental state." [*See* DE 16 at 14.] Rather, at the pleading stage no evidence needs to be pleaded at all and at trial circumstantial evidence will do. But *Bell Atl. Corp. v. Twombly*, 550 U.S. 5544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) do require, at this stage, "allegations plausibly suggesting (not merely consistent with)" FBAR willfulness. *See Twombly*, 550 U.S. at 557. The Government has offered no such allegations.

### II.    The Complaint fails to plausibly allege FBAR willfulness

In its Response, the Government points to the following paragraphs of its Complaint to argue that it has plausibly shown FBAR willfulness as Rule 8(a) requires: ¶55; ¶15–16; ¶18; ¶22–28; ¶31–32; ¶33–35; ¶38; and ¶49. [DE 16 at 16–18.] Defendants urge the Court to scrutinize these allegations carefully.

None of these allegations allege willfulness in a non-conclusory manner. And none of these allegations are more than "merely consistent with" FBAR willfulness. Defendants acknowledge that the Government's allegations are consistent with the Government's theory that Marie Green willfully failed to file her FBAR form to evade U.S. income taxes.

But they are just as consistent with the reality of this case: Marie Green was a housewife who relied upon her husband Isador to manage her financial and tax affairs until he died, when Marie Green was 85 years old. Thereafter, in her twilight years, she turned management of these affairs over to others. And, in so doing, she was not willful within the standard set forth in *Bedrosian v. United States*, 912 F. 3d 144, 153 (3d Cir. 2018) (stating that a person commits a

willful FBAR obligation if she "(1) clearly ought to have known that (2) there was a grave risk that [the filing requirement was not being met] and (3) [she] was in a position to find out for certain very easily."); *Accord*, *United States v. Dadurian*, 18-81276-CIV, DE 88 at 13–14 (S.D. Fla. Aug. 22, 2019) (adopting this standard).

Importantly, contrary to the Government's Response, this theory is not an affirmative defense. [*See* DE 16 at 18.] Instead, it is an alternative inference from the facts that the Government has pleaded in its Complaint, appropriate for this Court to consider under *Twombly* and *Iqbal*. And to defeat a claim for a willful FBAR violation, any delegation to others need not be "reasonable." Rather, it need only contradict the elements of FBAR willfulness articulated in *Bedrosian*.

### III.     The Government should be required to amend its Complaint

Defendants acknowledge that even though the Government has failed to plausibly plead FBAR willfulness, it should be given at least one opportunity to amend. In doing so, the Government should be required to plead specific facts that "show"—rather than merely "allege"—that Marie Green acted with the required mental state. *See Iqbal*, 566 U.S. at 679 ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").

### CONCLUSION

The Court should grant Defendants' Motion to Dismiss for the reasons articulated in this Reply and in the memorandum of law included with Defendants' initial Motion [DE 13]. Under *NEC Corp.*, the FBAR penalty is primarily penal in nature and accordingly abated upon Marie Green's death. Should the Court dismiss for this reason, it should do so with prejudice. Further, the Government has failed to plausibly allege that Marie Green acted willfully. Should the Court dismiss on this ground, the Government should be given an opportunity to amend.

Dated: December 16, 2019

                                          Respectfully Submitted,

                                          /s/ Derick Vollrath
                                          Jeffrey A. Neiman
                                          Fla. Bar No. 544469
                                          jneiman@mnrlawfirm.com
                                          Derick Vollrath
                                          Fla. Bar No. 126740
                                          dvollrath@mnrlawfirm.com
                                          **MARCUS NEIMAN & RASHBAUM LLP**
                                          100 Southeast Third Ave
                                          Suite 805
                                          Fort Lauderdale, Florida 33315
                                          Telephone: (305) 400-4269

                                          *Counsel for Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that on December 16, 2019, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record on the Service List.

                                          By:   /s/ Derick Vollrath
                                                     Derick Vollrath