**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:19-cv-24026-KMM

UNITED STATES OF AMERICA,

    Plaintiff,
v.

JACQUELINE D. GREEN, *et al.*,

    Defendants.
                                                  /

## ORDER ON MOTION TO DISMISS

THIS CAUSE came before the Court upon Defendants Jacqueline Green ("Jacqueline") and Bert Green's ("Bert") (collectively, "Defendants") Motion to Dismiss for Failure to State a Claim. ("Mot.") (ECF No. 13). Plaintiff United States of America (the "Government") filed a response in opposition. ("Resp.") (ECF No. 16). Defendants filed a reply. ("Reply") (ECF No. 18). The Motion is now ripe for review.

**I.    BACKGROUND**

The Government seeks to recover unpaid financial penalties imposed upon Marie M. Green ("Marie") for willfully failing to timely file accurate Forms TD F 90-22.1, Report of Foreign Bank and Financial Accounts ("FBAR"), for the years 2010 and 2011. Complaint ("Compl.") (ECF No. 1) ¶ 1. The Court first provides background regarding the FBAR filing requirements and then summarizes the factual background.

**A.    FBAR Filing Requirements**

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, commonly referred to as the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311–5314, 5316–5332, in order to combat money laundering in the United States. *See* Internal Revenue Serv., Bank Secrecy

Act, available at https://www.irs.gov/businesses/small-businesses-self-employed/bank-secrecy-act (last accessed April 1, 2020) ("BSA Guide"); Internal Revenue Manual § 4.26.16 (2017), available at https://www.irs.gov/irm/part4/irm_04-026-016 (last accessed April 1, 2020) ("IRS Manual"). "The BSA requires businesses to keep records and file reports that are determined to have a high degree of usefulness in criminal, tax, and regulatory matters." *See* BSA Guide. These reports "are heavily used by law enforcement agencies, both domestic and international[,] to identify, detect and deter money laundering whether it is in furtherance of a criminal enterprise, terrorism, tax evasion or other unlawful activity." *Id.* Congress authorized the Department of Treasury (the "Treasury") to implement the BSA. *See* 31 U.S.C. § 5314.

Pursuant to the BSA, United States "persons"[1] are required to file an FBAR indicating their financial interests in and/or signatory authority over a foreign account if certain conditions are met. *See* § 5314(a); 31 C.F.R. § 1010.350(a). Specifically, such persons must file an FBAR by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *See* 31 C.F.R. § 1010.306(c).

Congress authorized the Secretary of the Treasury (the "Secretary") to assess penalties against those who fail to satisfy the FBAR filing requirement. *See* 31 U.S.C. §§ 5321–22. The Secretary delegated authority to the Internal Revenue Service ("IRS") to impose criminal penalties, and to the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the Treasury, to impose civil penalties. *See* IRS Manual. In April 2003, FinCEN delegated its FBAR

---

[1] A "person" for purposes of the FBAR filing requirement is: (1) "[a] citizen or resident of the United States"; (2) "[a]n entity created or organized in the United States or under the laws of the United States," including but not limited to "a corporation, partnership, and limited liability company"; (3) "[a] trust formed under the laws of the United States"; or (4) "[a]n estate formed under the laws of the United States." *See* Internal Revenue Serv., IRS FBAR Reference Guide, http://www.irs.gov/pub/irs-utl/IRS_FBAR_Reference_Guide.pdf (last accessed April 1, 2020) ("IRS Reference Guide") at 2.

duties to the IRS. *See* IRS Manual; IRS Reference Guide. Thus, the IRS is responsible for "[i]nvestigating possible civil violations," "[a]ssessing and collecting civil penalties," and "[i]ssuing administrative rulings." IRS Reference Guide at 1.

The IRS may impose civil penalties based on negligence, *see* § 5321(a)(6)(A), a pattern of negligent activity, *see* § 5321(a)(6)(B), a non-willful violation, *see* § 5321(a)(5)(A), (B), and a willful violation, *see* § 5321(a)(5)(C). For willful violations, the IRS may impose a criminal penalty and/or a civil penalty. *See* §§ 5321–22. The civil penalty for a willful violation may not exceed the greater of $100,000, or 50% of the amount in the unreported account at the time of the violation. *See* § 5321(a)(5)(C).

### B. **Factual Background**[2]

Marie, the mother of the Defendants, was a United States citizen residing in the Southern District of Florida at the time of her death on August 5, 2018. Compl. ¶¶ 7, 11–12. Jacqueline is a co-trustee of the Marie Mary Green Revocable Trust, which Marie settled before she died, and the personal representative of Marie's estate. *Id.* ¶¶ 9, 11. Bert is a co-trustee of the Trust. *Id.* ¶ 12.

Prior to her death, Marie had interests in or signatory authority over several foreign bank accounts dating back to the 1980s. *Id.* ¶¶ 13–48. First, Marie had a financial interest in and signatory authority over an account with Bank Leumi Le-Israel in Tel Aviv, Israel ("Bank Leumi"). *Id.* ¶ 17. On August 13, 1980, Isidor Green ("Isidor"), Marie's husband until his death in July 2005, directed the creation of Arbel Holding, Inc., a Panamanian corporation. *Id.* ¶¶ 10, 13. On May 24, 1988, Arbel Holding's Board of Directors authorized the company to open an

---

[2] The background facts are taken from the Complaint and accepted as true for purposes of ruling on this Motion. *Fernandez v. Tricam Indus., Inc.*, No. 09-22089-CIV-MOORE/SIMONTON, 2009 WL 10668267, at *1 (S.D. Fla. Oct. 21, 2009).

3

account with Bank Leumi and instruct Bank Leumi that Isidor, Marie, and Defendants were authorized to direct the investment funds in the account and to withdraw funds. *Id.* ¶ 14. In July 1990, Arbel Holding instructed Bank Luemi to close its accounts and transfer the assets to an account in the name of Isidor and Marie, which ended with the digits '617. *Id.* ¶ 15. On April 25, 1997, Isidor, Marie, and Bert opened an account with Bank Luemi in the name of "Acuva Bat Itzhak," which also ended with the digits '617 ("'617 Account") and therefore appears to be same as the account opened in July 1990. *Id.* ¶ 16. Isidor, Marie, and Bert requested that the account contain the name "Acuva Bat Itzhak" but not any of their names and to hold all mail concerning the account rather than transmit it to the United States. *Id.* ¶ 18. Thereafter, in 2005 and 2006, Marie signed on behalf of "Acuva Bath Itzhak" to acknowledge receipt of mail held at Bank Leumi concerning the '617 Account, signed instructions to Bank Leumi regarding how funds in the '617 Account should be invested, and signed a declaration with respect to the Leumi Account stating that she was not a resident of Israel for purposes of the Israeli Income Tax Ordinance. *Id.* ¶¶ 19–21.

Second, Marie had a financial interest in an account with Union Bancaire Privee ("UBP") in Switzerland. *Id.* ¶ 25. On July 13, 2006, a Panamanian entity with the name "Acuva Bath Itzhak Corp." was formed, without a business purpose, on Marie's behalf and opened an account with UBP ("UBP Account"). *Id.* ¶¶ 22–24. The UBP Account's opening agreement instructed UBP to hold mail concerning the account. *Id.* ¶ 26. Although, Acuva Bath Itzhak Corp. stated on a Swiss banking form that Marie was the "beneficial owne[r] of the assets," Acuva Bath Itzhak Corp. filed a false "Declaration of Non-U.S. Entity status" regarding the UBP account, which stated that it was the beneficial owner of the UBP Account for the purposes of U.S. Withholding Tax regulations. *Id.* ¶¶ 26, 28. On June 9, 2009, Marie and Jacqueline visited UBP in Geneva,

4

Switzerland, withdrew cash from the UBP Account, and instructed UBP to close the account and transfer the assets pursuant to forthcoming instructions. *Id.* ¶ 29. The next month, Acuva Bath Itzhak liquidated the UBP Account to transfer the balance to an account with Bank Leumi in the name of Templaide Associates Inc. ("Templaide Account"). *Id.* ¶ 30.

Third, Marie had a financial interest in the Templaide Account. *Id.* ¶ 34. On June 23, 2008, a Panamanian entity named "Templaide Associates Inc." ("Templaide") was formed, without a business reason, on Marie's behalf and on July 31, 2008, Templaide opened an account with Bank Leumi, the Templaide Account. *Id.* ¶¶ 31–33. While opening the Templaide Account, Templaide provided a false "Declaration of Non-U.S. Entity Status" to Bank Leumi, which stated that the beneficial owner of the account was a corporation and not a U.S. citizen or resident. *Id.* ¶ 35. However, Templaide also provided to Bank Leumi a "Lawyer's Confirmation regarding the identification details of the parties controlling the Corporate Entity," which contradicted the "Declaration of Non-U.S. Entity Status" because it listed three British citizens, Marie, Jacqueline, and Jacqueline's husband as controlling Templaide. *Id.* ¶ 36. During 2010, the highest balance in the Templaide Account was $5,630,938. *Id.* ¶ 37. Although Marie was required to file an FBAR on or before June 30, 2011 reporting her interest in the Templaide Account, she did not. *Id.* ¶¶ 56, 57. On January 20, 2010, the Templaide Account was liquidated, the funds were converted to Euros and Swiss francs, and then the funds were transferred to an account at Mercantile Discount Bank B.M. in Tel Aviv, Israel in the name of "Uzi Pinchasi Adv. In Trust for Green Marie Mary" ("Mercantile Account"). *Id.* ¶ 38. However, Marie never reported the Mercantile Account to the United States on an FBAR. *Id.* ¶ 39.

Fourth, Marie had a financial interest in an account with the Bank of Jerusalem. *Id.* ¶ 43. On December 16, 2009, a Panamanian entity named "Black Pearl Worldwide Corporation" was

5

formed, without a business reason, and thereafter opened an account with Bank of Jerusalem in Jerusalem, Israel in the name of Blackpearl Worldwide ("BoJ Account"). *Id.* ¶¶ 40–42. During 2010, the highest balance in the BoJ Account was $3,484,383 and during 2011, the highest balance was $3,572,440. *Id.* ¶¶ 44, 45. Although Marie was required to file an FBAR reporting her interest in the BoJ Account for 2010 and 2011, she did not. *Id.* ¶¶ 56–59. On October 22, 2012, Blackpearl Worldwide transferred the balance of the BoJ Account to another account. *Id.* ¶ 46.

Fifth, Marie had an interest in an account with BNP Paribas, S.A. *Id.* ¶ 47. On June 25, 1990, Isidor and Marie opened a joint account with United Overseas Bank in Geneva Switzerland, signing a form that indicated that they were the beneficial owners of the account. *Id.* The account was later held at a Geneva, Switzerland branch of BNP Paribas, S.A. *Id.* In 2008 or 2009, BNP Paribas, S.A. officials contacted Jaqueline on behalf of Marie and informed her that it was necessary to regularize the documentation on the account or close it. *Id.* ¶ 48. Jacqueline chose to close the account. *Id.*

On October 31, 2013, Marie applied to enroll in the IRS's 2012 Offshore Voluntary Disclosure Program ("OVDP"), which offered a coordinated, standardized settlement to U.S. taxpayers who had failed to report foreign bank accounts by filing FBARs and failed to pay income tax on income received in those foreign bank accounts. *Id.* ¶ 49. After Marie enrolling into the 2012 OVDP, she attempted to "directly enter" another offshore disclosure program offered by the IRS. *Id.* ¶ 51. After Marie was informed that she was not allowed to directly enter the other program, she informed the IRS that she intended to withdraw from the 2012 OVDP and the IRS removed her from the program. *Id.* ¶¶ 51, 52.

On June 1, 2017, a duly authorized delegate of the Secretary assessed civil penalties against Marie for willfully failing to file FBARs for 2010 as to the BoJ and Templaide Accounts, and 2011

as to the BOJ account. *Id.* ¶ 60. Marie failed to pay the assessed penalties, which have now accrued interest and a penalty for failure to pay a lawful debt pursuant to 31 U.S.C. § 3717. *Id.* ¶¶ 61, 62.

On September 30, 2019, the Government filed the Complaint seeking to recover the unpaid financial penalties. *Id.* ¶ 1. Now, Defendants move to dismiss the Complaint for failure to state a claim. *See generally* Mot.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III. DISCUSSION

Defendants argue that the Government's claim fails because (1) the FBAR penalties abated upon Marie's death, and (2) even if the penalties survive Marie's death, the Government has not

7

plausibly alleged that Marie willfully failed to disclose the accounts and file the FBARs. *See generally* Mot. In response, the Government argues that (1) the FBAR penalties survive Marie's death and (2) the Government's Complaint plausibly alleges a claim for relief. *See generally* Resp. The Court considers Defendants' arguments in turn.

A. <u>FBAR Penalties Survive Marie's Death</u>

An action brought against a deceased party cannot continue "unless the cause of action, on account of which the suit was brought, is one that survives by law." *Ex Parte Schreiber*, 110 U.S. 76, 80 (1884). In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law. *James v. Home Constr. Co. of Mobile*, 621 F.2d 727, 729 (5th Cir. 1980). It is well-settled in federal common law that while remedial actions survive the death of the plaintiff, penal actions do not. *Ex Parte Schreiber*, 110 U.S. at 80; *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 876 (11th Cir. 1986); *James*, 621 F.2d at 730. "A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." *See United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993) (citing *In re Wood*, 643 F.2d 188, 190–91 (5th Cir. 1980)). If a claim does not fall neatly within the penal or remedial categories, a court should determine whether the claim's primary purpose is penal or remedial. *See Bradley v. Franklin Collection Serv., Inc.*, No. 5:10-cv-1537-AAK, 2012 WL 12895015, at *4 (N.D. Ala. Apr. 10, 2012) (emphasis in original and citation omitted) (holding that "'the *primary purpose* of the private right of action created by RICO is remedial,' and as such, a civil RICO claim survives the death of a plaintiff").

The Court of Appeals for the Eleventh Circuit has instructed generally that in deciding whether a statute is penal or remedial, a court must examine three factors: "(1) whether the purpose

8

of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *NEC Corp.*, 11 F.3d at 137 (internal quotation marks omitted) (quoting *In re Wood*, 643 F.2d at 191). However, the *NEC Corp.* factors were developed with respect to liquidated damages under the Truth in Lending Act to be awarded to an injured consumer. *See In re Wood*, 643 F.2d at 191. The *NEC Corp.* factors draw a distinctions between whether the wrongs were to an individual or the public and whether the recovery runs to an individual or the public. *See NEC Corp.*, 11 F.3d at 137. Therefore, the factors do not allow for a situation where the United States itself has suffered a harm because of a defendant's conduct. Thus, the *NEC Corp.* factors, although instructive, are not on point here because it is the Government itself that has been harmed.

Further, the Court of Appeals for the Eleventh Circuit has not opined specifically whether a penalty pursuant to § 5321(a)(5)(C) survives the death of a party. The decisions in *United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354 (M.D. Fla. 2018), and *United States v. Park*, 389 F. Supp. 3d 561 (N.D. Ill. 2019), held that a civil penalty pursuant to § 5321(a)(5)(C) survives the death of a party.[3] *See Park*, 389 F. Supp. 3d at 575–76; *Estate of Schoenfeld*, 344 F. Supp. 3d at 1376. In *Estate of Schoenfeld*, the court applied the analysis outlined in *Hudson v. United States*, 522 U.S. 93, 99–100 (1997). *See Estate of Schoenfeld*, 344 F. Supp. 3d at 1369–76. The *Hudson* framework seeks to determine "'whether the scheme was so punitive either in purpose or effect' as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty'"

---

[3] *Park* cites *Estate of Schoenfeld* to conclude that the FBAR civil penalty survives the death of a party and therein relies upon the *Estate of Schoenfeld*'s analysis. *See Park*, 389 F. Supp. 3d at 575.

Notably, *dicta* in both *Estate of Schoenfeld* and *Park* strongly supports a holding that the FBAR penalty is remedial in nature and survive the death of a party.

by (1) asking whether the legislature expressed a preference for labeling the penalizing mechanism as civil or penal, and (2) applying the seven *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), factors. *Hudson*, 522 U.S. at 99–100 (alteration in original) (citation omitted). The *Kennedy* factors include:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Estate of Schoenfeld*, 344 F. Supp. 3d at 1370 (quoting *Kennedy*, 372 U.S. at 168–69). "[N]o one factor should be considered controlling as they 'may often point in differing directions.'" *See Hudson*, 522 U.S. at 101. Notably, "where Congress has indicated an intention to establish a civil penalty, . . . 'only the clearest proof could suffice'" to establish that the penalty is penal in nature. *United States v. Ward*, 448 U.S. 242, 248–49 (1980) (citation omitted).

Although the *Hudson* analysis was originally applied for a different purpose than at issue here, the Court finds the *Hudson* analysis, including the *Kennedy* factors, helpful because the analysis may be implemented to provide a robust examination as to whether a penalty is remedial or penal in nature. *See Estate of Schoenfeld*, 344 F. Supp. 3d at 1370; *see also Reiserer v. United States*, 479 F.3d 1160, 1162–64 (9th Cir. 2007) (applying the *Kennedy* factors in determining whether the penalty for promoting abusive tax shelters under I.R.C. § § 6700 and 6701 survives the attorney's death); *United States v. $84,740.00 Currency*, 981 F.2d 1110, 1113 (9th Cir. 1992) (applying the *Kennedy* factors to determine whether a forfeiture survives the death of the wrongdoer).

Although the *NEC Corp.* and *Hudson* analyses are useful to the Court in determining whether the FBAR penalty is remedial or penal in nature, neither is precisely on point here. Therefore, the Court examines the relevant considerations which are embodied in both analyses to determine whether the FBAR penalty is remedial or penal.

Here, as an initial matter, the Court notes that the statute denominates the FBAR penalties as "civil penalties" and confers enforcement authority upon the Secretary, indicating that Congress intended to provide a civil penalty. *See generally* § 5321; *see also Ward*, 448 U.S. at 249 ("[W]e believe it quite clear that Congress intended to impose a civil penalty upon persons in Ward's position" based on Congress' label); *Hudson*, 522 U.S. at 103 ("That such authority was conferred upon administrative agencies is *prima facie* evidence that Congress intended to provide for a civil sanction."). However, Congress has not specifically expressed its intention as to whether a claim to recover a penalty pursuant to § 5321(a)(5)(C) survives the death of a party. *See Estate of Schoenfeld*, 344 F. Supp. at 1369. Thus, the Court must turn to federal common law. *See NEC Corp.*, 11 F.3d at 137.

First, the Government itself has suffered a monetary harm as a result of Defendants' conduct. FBAR violations may deprive the Government of taxes on investment gains and the Government likely expends significant resources on investigating foreign accounts. *See United States v. Garrity*, No. 3:15-CV-243(MPS), 2019 WL 1004584, at *9 (D. Conn. Feb. 28, 2019). Moreover, FBAR violations may prevent the Government from investigating and prosecuting crimes and may aid in concealing other misconduct. *Id.* For example, in this case, the Government alleges that Marie had a financial interest in or signatory authority over numerous foreign bank accounts dating back to the 1980s. *See* Compl. ¶¶ 13–48. Marie's failure to satisfy the FBAR filing requirements may have deprived the Government of taxes on investment gains she made in

the accounts at issue, hindered the Government from investigating and prosecuting crimes committed by Marie or others, and forced the Government to expend significant resources to investigate Marie's accounts.

Second, the FBAR penalty has a remedial purpose: it allows the Government to recover for the aforementioned monetary harm. The FBAR penalty acts "as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Helvering*, 303 U.S. 391, 401 (1938); *see also Reiserer*, 479 F.3d at 1164 (recognizing that tax penalties "serve the remedial goal of reimbursing the government for the costs in investigating tax fraud and for possible lost tax revenue"). The FBAR seeks "to identify persons who may be using foreign financial accounts to circumvent United States law," and "to identify or trace funds used for illicit purposes or to identify unreported income maintained or generated abroad." See IRS Reference Guide at 2; *Cal. Bankers Ass'n v. Schultz*, 416 U.S. 21, 26 (1974) (citation omitted) (recognizing that in passing the BSA, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal tax, and regulatory enactments."). Under such circumstances the Supreme Court has recognized the remedial character of the sanction to safeguard the public revenue and reimburse the Government. *See Helvering*, 303 U.S. at 401.

However, the FBAR penalty also serves deterrent and retributive purposes, the quintessential aims of punishment. While "[i]n one sense, every law imposing a penalty of forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial." *Taylor v. United States*, 44 U.S. (3 How.) 197, 210 (1845). Further, as noted by the Supreme Court, "all civil penalties have some deterrent effect," and none

are "'solely' remedial (*i.e.*, entirely nondeterrent)." *Hudson*, 522 U.S. at 102 (citations omitted). Therefore, although the FBAR penalty serves some retributive and deterrent purposes, those purposes does not unilaterally render the FBAR penalty penal in nature.

Third, the FBAR penalty is not wholly disproportionate to the harm the Government itself has suffered. The maximum penalty pursuant to § 5321(a)(5)(C) for willfully failing to file a required FBAR is the greater of $100,000 or half of the account's balance at the time of the violation. *See* § 5321(a)(5)(C). The FBAR penalty need not be tied to the Government's loss directly to be remedial. *See United States v. Bajakajian*, 524 U.S. 321, 342–43 (1998). Notably, the FBAR penalty ties the amount to the balance of the account, which reflects Congress' likely determination that the value of the harm to the Government itself is correlated to the balance of the account.

Further, the Supreme Court and other courts have found a provision similar to the FBAR penalty reasonable in light of the expenses the Government incurs to investigate misconduct and compensate it for the monetary harm it has suffered. In *Helvering*, the Supreme Court held that a provision of the Revenue Act which imposed a penalty of 50% of the underpayment of income tax in addition to the recovery of the underpayment was remedial because it primarily was "a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Helvering*, 303 U.S at 401. Relying on *Helvering*, other Circuits have held likewise. *See Bickham Lincoln-Mercury Inc. v. United States*, 168 F.3d 790, 794–95 (5th Cir. 1999) (finding that a 50% assessment was reasonable "to offset the cost of investigating persons who conceal income from the IRS"); *Thomas v. Comm'r of Internal Revenue Serv.*, 62 F.3d 97, 103 (4th Cir. 1995) (citation omitted) ("[T]he civil sanction to be exacted from Thomas is remedial in character, because 'it merely reimburses the government

for its actual costs arising from the defendant's criminal conduct.'"); *Rau's Estate v. Comm'r of Internal Revenue*, 301 F.2d 51, 56–57 (9th Cir. 1962) (upholding a 50% tax assessment); *Kirk v. Comm'r of Internal Revenue*, 179 F.2d 619, 622 (1st Cir. 1950) (noting that the purpose of a 50% tax assessment is to "recompense [the Government] for the loss and expense occasioned by frauds perpetrated upon its revenue").

Moreover, as to the FBAR penalty, the amount of $100,000 or 50% of the account's balance at the time of the violation was selected to ensure that the Government would be made completely whole. *See United States v. Grannis*, 172 F.2d 507, 514–16 (4th Cir. 1949) (finding that the "chief purpose" of a provision of the False Claims Act requiring forfeiture of $2,000 plus "double the amount of damages which the United States may have sustained . . . together with the costs of suit" was "to provide for restitution to the Government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole"). Indeed, at least one court has determined that although "[a] 50% willful FBAR penalty—the maximum penalty permitted by statute—is severe," "it is an appropriate penalty in at least some circumstances" "given the ills it combats." *Crawford v. U.S. Dep't of the Treasury*, No. 3:15-cv-250, 2015 WL 5697552, at *16 (S.D. Ohio Sept. 29, 2015).

Accordingly, because FBAR violations likely deprive the Government of taxes on investment gains and require the Government to expend significant resources investigating foreign accounts, the FBAR penalty is not wholly disproportionate to the monetary harm the Government itself suffers.

Finally, granting a windfall to estates of violators of the FBAR requirements because the violator suffered the paradoxical fortune and misfortune of passing away after the violation

14

occurred and before the Government filed suit against him or her for FBAR violations contradicts the remedial purpose of the FBAR filing requirements. *See Kirk*, 179 F.2d at 622.

In sum, the FBAR penalty is the proverbial square peg in the round hole; it fits perfectly in neither of the round holes of the remedial-penal dichotomy. Rather, the FBAR penalty is primarily remedial with incidental penal effects. Accordingly, the FBAR penalties pursuant to § 5321(a)(5)(C) survive Marie's death.

### B. The Government's Complaint Adequately Alleges Willfulness

Defendants argue that the Government fails to state a claim because Marie's alleged acts are merely coincidental with willful behavior and an obvious alternate explanation exists. *See* Mot. at 6–16. In response, the Government argues that the circumstances alleged in the Complaint are sufficient to state a claim that Marie's failure to file the required FBARs was willful. Resp. at 15–18.

"In order to be subject to a willful FBAR penalty, the following elements are required: (1) the person must be a U.S. citizen; (2) the person must have or had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period; and (4) the person must have willfully failed to disclose the account and file a FBAR." *United States v. Schwarzbaum*, No. 18-cv-81147-BLOOM/Reinhart, 2019 WL 3997132, at *3 (S.D. Fla. Aug. 23, 2019) (citation omitted). The Parties only dispute the fourth element, whether the Complaint sufficiently alleges that Marie willfully failed to disclose the account and file the FBAR.

As an initial matter, the Parties dispute the applicable definition of willfulness. *See* Mot. at 11; Resp. at 12–14. Defendants argue that willfulness requires the intentional violation of a known legal duty. Mot at 11. In response, the Government argues that mere recklessness is

sufficient. Resp. at 13. However, Defendants concede to applying the recklessness definition solely for the purposes of this Motion and therefore the Court need not determine at this juncture which definition of willfulness is applicable. Mot. at 11. Thus, for the purposes of this Motion, the Court applies the recklessness definition of willfulness.

"Willfulness does not require actual knowledge of the duty to report interest in a foreign financial account, but mere reckless or careless disregard of that statutory duty." *United States v. Brandt*, No. 17-80671-CIV-MIDDLEBROOKS, 2018 WL 1121466, at *4 (S.D. Fla. Jan. 24, 2018) (citing *United States v. Williams*, 489 F. App'x 655, 658–59 (4th Cir. 2012); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204–05, 1209–10 (D. Utah 2012)). "While the term 'recklessness' is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard; action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Schwarzbaum*, 2019 WL 3997132, at *3 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). "[W]illfulness in the context of violations of § 5321 may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information, and it can be inferred from a conscious effort to avoid learning about reporting requirements." *Norman v. United States*, 138 Fed. Cl. 189, 192 (Fed. Cl. 2018), *aff'd* 942 F.3d 111 (Fed. Cir. 2019) (citation and internal quotation marks omitted). In other words, "willful intent may be proved by circumstantial evidence and reasonable inferences drawn from facts because direct proof of the taxpayer's intent is rarely available." *McBride*, 908 F. Supp. 2d at 1205.

Here, the Government alleges sufficient circumstantial evidence for the Court to infer that Marie acted willfully. First, Marie failed to timely report or pay taxes on more than $1.4 million

in income she received in her foreign accounts from 2005 to 2011.[4] Compl. ¶ 55. Second, Marie's long history of having foreign bank accounts is peppered with questionable conduct, including using accounts in other names as personal accounts, requesting that the banks honor instructions that the account not contain her name or her family members' names, and instructing the banks to hold mail related to the account instead of sending it to the United States. *Id.* ¶¶ 15, 16, 18, 26. Third, on two instances entities on Marie's behalf have made material misstatements to foreign banks as to Marie's interest in the accounts. When Acuva Bath Itzhak Corp., a Panamanian corporation without any business purpose, opened the UBP Account, it informed UBP that Marie was the beneficial owner, but also told UBP that the corporation was the beneficial owner "for the purposes of U.S. Withholding Tax regulation." *Id.* ¶¶ 22, 23, 26, 28. In addition, when Templaide, another Panamanian corporation without a business purpose which was controlled by Marie and others, opened the Templaide account, Templaide made a false statement to Bank Leumi claiming that no U.S. person had an interest in the account. *Id.* ¶¶ 31–35. Subsequently, the Templaide Account funds were transferred to the Mercantile Account, which has never been reported on an FBAR filing. *Id.* ¶ 38. From Marie's lengthy history of "conduct meant to conceal or mislead sources of income or other financial information" the Court can infer that Marie acted willfully in failing to disclose the accounts and file the FBAR. *Norman*, 138 Fed. Cl. at 192.

Defendants argue, relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that the aforementioned circumstantial evidence is also consistent with an alternate explanation and therefore, the Government has failed to sufficiently allege that Marie willfully failed to report the accounts and file the required FBAR. Mot. at 6–16.

---

[4] The Complaint contains a typographical error in paragraph fifty-five: the amount unreported between 2005 and 2011 was $1.4 million, not $1.7 million. *See* Resp. at 15 n.5.

Specifically, Defendants argue that the circumstantial evidence is consistent with the narrative that Marie "was a housewife who relied upon her husband Isador to manage her financial and tax affairs until he died, when Marie . . . was 85 years old. Thereafter, in her twilight years, she turned management of these affairs over to others. And, in doing so, she was not willful." Reply at 10.

In *Twombly*, the Supreme Court examined whether the plaintiffs stated a plausible claim that the defendants were engaged in a conspiracy in violation of § 1 of the Sherman Act, which prohibits unreasonable restraint on trade "effected by contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553. The "crucial question" at issue was whether the defendants' acts stemmed "from independent decision or from an agreement, tacit or express." *Id.* The Court opined that a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Further, the Court explained that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Thus, the Court opined that "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id.* Ultimately, the Supreme Court held that the plaintiffs did not satisfy this standard because "the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the [defendants]." *Id.* at 564.

In *Iqbal*, the Supreme Court considered whether Iqbal's complaint plausibly stated a claim that Attorney General Ashcroft and Director Mueller adopted post-September 11 unconstitutional detention policies that subjected him to arrest and harsh conditions of confinement based on discriminatory criteria. 556 U.S. at 666. The Court opined that to state a claim, Iqbal "must plead sufficient factual matter to show that [Ashcroft and Mueller] adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 677. Further, the Court reaffirmed its holding in *Twombly* that "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and internal quotation marks omitted). The Court also explained that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)). Ultimately, the Supreme Court held that "given more likely explanations," invidious discrimination was not a plausible conclusion. *Id.* at 681.

Here, as discussed *supra*, the Government has alleged sufficient circumstantial evidence for the Court to infer that Marie acted willfully. Although Marie's acts alleged in the Complaint may also be consistent to a degree with Defendants' narrative, the Court finds that in its judicial experience Defendants' narrative is not "a more likely explanation" and the Complaint provides "enough fact to raise a reasonable expectation that discovery will reveal evidence" of Marie's willful misconduct. *See Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 679, 681. The Government alleges decades of questionable financial maneuvering by Marie, Isador, and others of their behalf that did not cease after Isador's death. *See generally* Compl. Indeed, according to the Complaint,

Marie was personally involved in many of the dubious activities. Thus, Defendants' argument that the Government has failed to state a claim because Marie's behavior is also consistent with more likely, innocent behavior is unconvincing.

### IV. CONCLUSION

Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 13) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 27th day of April, 2020.

K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record